206 F.3d 1304 (9th Cir. 2000)
 SHEROL DIRUZZA, aka Sherol Janc, Plaintiff-Appellant,
v.
COUNTY OF TEHAMA, a public entity; ROBERT HEARD, as an individual and as Sheriff for the County of Tehama; JERRY FLOYD, as an individual and as Undersheriff of the County of Tehama, Defendants-Appellees.
 No. 98-15997
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 12, 1999
Filed March 21, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Mike McGuire and David A. Prentice, McGuire & Prentice, Sacramento, California, for the plaintiff-appellant.
 J. Scott Smith, Angelo, Kilday & Kilduff, Sacramento, California, for defendant-appellee County of Tehema.
 Stephen E. Horan, Porter, Scott, Weiberg & Delehant, Sacramento, California, for defendants-appellees Robert Heard and Jerry Floyd.
 Michael Rains, Carroll, Burdick & McDonough, San Francisco, California, for amicus curiae the Peace Officers Research Association of California, Peace Officers Research Association of California Legal Defense Fund, Kern Law Enforcement Association, and Elko County Sheriffs' Employees Association.
 Appeal from the United States District Court for the Eastern District of California; William B. Shubb, District Judge, Presiding. D.C. No. CV-96-00596-WBS
 Before: Stephen Reinhardt, Diarmuid F. O'Scannlain, and William A. Fletcher, Circuit Judges.
 Opinion by Judge William A. Fletcher; Dissent by Judge O'Scannlain
 W. FLETCHER, Circuit Judge:
 
 
 1
 Plaintiff Sherol DiRuzza was a deputy sheriff in Tehama County from 1992 to 1995. During the election season in 1994, she supported incumbent Sheriff Mike Blanusa in his bid for reelection. Blanusa lost to Sheriff Robert Heard, one of the defendants in this case. DiRuzza asserts that defendants Heard and Undersheriff Jerry Floyd caused her to lose her job as a result of her political activity in support of Blanusa.
 
 
 2
 The district court concluded that DiRuzza's political activities were not protected under the First Amendment because deputy sheriffs are policymakers, and that political loyalty is an appropriate requirement for her job. The district court accordingly held that defendants were allowed to retaliate against DiRuzza for her political speech. The district court granted summary judgment to defendants Heard, Floyd and Tehama County, and DiRuzza has timely appealed.
 
 
 3
 We reverse the district court's grant of summary judgment. We hold that defendants have failed to show as a matter of law that DiRuzza was a policymaker and that political loyalty was therefore an appropriate requirement for her job. We remand for a determination of whether her actual duties were those of a policymaker. We further hold that the law protecting non-policymaking public employees from retaliation for the exercise of their First Amendment rights was clearly established in 1995, and we remand for a determination of the reasonableness of the actions of defendants Heard and Floyd in light of the then-clearly established law. Finally, we remand for further proceedings to determine, whether defendants Heard and Floyd engaged in political retaliation.
 
 
 4
 * In November 1994, incumbent Tehama County Sheriff Mike Blanusa was defeated by defendant Sheriff Robert Heard. Heard assumed office as the new sheriff on January 3, 1995. DiRuzza had publicly supported Blanusa in the election, even appearing in a televised political advertisement on his behalf. Prior to Heard's assuming office, DiRuzza discharged her service revolver out of her bedroom window during a domestic dispute in which her fiance allegedly damaged her car, tore her phone off the wall, and threatened her with physical violence. As a result of this incident, Blanusa suspended DiRuzza for 30 days. On December 15, 1994, the district attorney charged DiRuzza with the felony of "gross negligent discharge of a firearm" and the misdemeanor of "exhibiting a firearm in a rude and threatening manner." Cal. Penal Code SS 246.3 and 417(a)(2). After Heard took office in January, DiRuzza was allowed to plead guilty to the lesser infraction of disturbing the peace, but only on condition that she resign her position as deputy sheriff.
 
 
 5
 On March 26, 1996, DiRuzza filed suit in federal district court, alleging twelve federal and state causes of action against Sheriff Heard, Undersheriff Floyd, and Tehama County. The gravamen of her complaint was that Heard and Floyd retaliated against her because she had supported Blanusa in the election. She alleged that, due to her political support of Blanusa and opposition to Heard, she was not resworn as a deputy after the election, was given undesirable shifts, and was forced to accept resignation under threat of a felony charge. By the time the district court ruled on defendants' motion for summary judgment, DiRuzza had narrowed her suit under federal law to claims under 42 U.S.C.SS 1983 and 1985, and sought only damages as a remedy.
 
 
 6
 Defendants at first denied that there was any political retaliation against DiRuzza, contending, in the words of the district court, "that all the alleged adverse employment actions were due to the pending felony charge of negligent discharge of her service weapon." At summary judgment, defendants proposed as an undisputed material fact that neither Heard nor Floyd "knew of plaintiff's support for the former Sheriff Blanusa." DiRuzza disputed this assertion and defendants subsequently filed a supplemental brief arguing that irrespective of what knowledge they had, there is no constitutional prohibition against an elected sheriff's termination of a deputy for partisan reasons.
 
 
 7
 In granting summary judgment for all defendants on DiRuzza's claims under SS 1983 and 1985, the district court held, in essence, that deputy sheriffs in California are policymakers and may be fired for political reasons. In so holding, the district court relied upon three cases from other circuits holding that deputy sheriffs are policymakers. See Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997) (en banc), cert. denied, 522 U.S. 1090 (1998); Upton v. Thompson, 930 F.2d 1209 (7th Cir. 1991); Terry v. Cook, 866 F.2d 373 (11th Cir. 1989). The district court supported its holding that DiRuzza was a policymaker and therefore subject to partisan dismissal by noting that under Cal. Gov't Code S 24100 a deputy sheriff exercises the same general authority as the sheriff. The district court further held, in the alternative, that individual defendants Heard and Floyd were entitled to qualified immunity because they had not violated a clearly established right. The district court then declined to exercise supplemental jurisdiction over the remaining state law claims.
 
 
 8
 We review de novo a grant of summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether the district court correctly applied the law and whether there are any genuine issues of material fact. Id.
 
 II
 
 9
 A. Was Deputy Sheriff DiRuzza a Policymaker?
 
 
 10
 We must first decide whether DiRuzza could be fired because of her political activity. "Government officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 714 (1996) (citing Elrod v. Burns, 427 U.S. 347 (1976)); Branti v. Finkel, 445 U.S. 507 (1980). The key inquiry is whether DiRuzza held a policymaking position where political affiliation was a "reasonably appropriate requirement" for the job. See O'Hare, 518 U.S. at 719.
 
 
 11
 The Supreme Court has held repeatedly that public employees are protected from retaliation for the exercise of their First Amendment rights. "A state may not condition public employment on an employee's exercise of his or her First Amendment rights." O'Hare, 518 U.S. at 717. "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate." Rutan v. Republican Party of Ill., 497 U.S. 62, 76 (1990) (emphasis added). However, an employee's rights are not absolute and must be balanced against the role of government as an employer. See Pickering v. Board of Educ., 391 U.S. 563, 568 (1968) (finding that the court must "balance . . . the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees").
 
 
 12
 Recognizing that there are some circumstances in which an employee's First Amendment rights are not absolute, the Supreme Court has carved out a narrow exception to the First Amendment's protection in cases where the public employee is a policymaker or confidential employee. This exception was first enunciated in 1976 in Elrod v. Burns, where four non-civil service employees of a sheriff's department were fired by the new sheriff because they failed to affiliate themselves with the party of newly elected Sheriff Elrod. One employee was the Chief Deputy of the Process Division, another a bailiff, and the third a process server; the position of the fourth employee was not described. Elrod, 427 U.S. at 350-51. The Supreme Court held that these patronage dismissals were unconstitutional. Justice Brennan's plurality opinion broadly condemned the constitutional evils of the patronage system, but recognized an exception for "policymaking positions" where "the employee acts as an adviser or formulates plans for the implementation of broad goals." Elrod, 427 U.S. at 367-68. Justice Stewart concurred separately, joined by Justice Blackmun, stating,"The single substantive question involved in this case is whether a nonpolicymaking, non-confidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot." Id. at 37475 (Stewart, J., concurring).
 
 
 13
 The policymaking exception articulated in Elrod was refined in 1980 in Branti v. Finkel, in which a newly appointed Democratic public defender gave notices of termination to Republican assistant public defenders in the office. The Court held that the terminations were unconstitutional because an assistant public defender does not occupy a position where "party affiliation is an appropriate requirement for the effective performance of the public office." Branti, 445 U.S. at 518. Rather, "[t]he primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State," and "whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests." Id. at 519. However, the Court was careful to withhold judgment on district attorneys, who exercise "broader public responsibilities." Id. at 519 n.13. Indeed in Fazio v. City and County of San Francisco, 125 F.3d 1328 (9th Cir. 1997), implementing Elrod and Branti, this court has held that certain deputy district attorneys are policymakers who may be terminated for partisan reasons.
 
 
 14
 In holding that a California deputy sheriff is a policymaker, the district court relied on two out-of-circuit cases that upheld dismissals of 42 U.S.C. S 1983 actions by deputy sheriffs on the ground that they were policymakers, Jenkins, 119 F.3d at 1156; Terry, 866 F.2d at 373, and a third out-of-circuit case that upheld qualified immunity on the ground that "deputy sheriffs operate with a sufficient level of autonomy and discretionary authority to justify a sheriff's use of political considerations when determining who will serve as deputies," Upton, 930 F.2d at 1218. These three cases held that deputy sheriffs in North Carolina (Jenkins), Alabama (Terry), and Illinois (Upton) are policymakers subject to termination for partisan reasons.[1] We are willing to assume arguendo that these holdings are correct, based on the different nature of the job performed by deputy sheriffs in these circuits and these states. However, we do not believe that a per se rule concerning deputy sheriffs is appropriate in this circuit and, in particular, in California.
 
 
 15
 Under California law, a county sheriff may appoint his or her "deputies." Cal. Gov't Code S 24101. All peace officers employed in the county sheriff's office, at whatever level, are sheriff's deputies. See generally People v. Otto, 77 Cal. 45 (1888). Among the deputies are higher-level employees such as the undersheriff, lieutenant, sergeant and captain as well as lower-level employees such as line peace officers and jail custodians. The title "deputy sheriff" or "sheriff's deputy" is thus not a clear job category with consistent responsibilities in California. Any categorization based upon job title alone obscures rather than clarifies the nature of the duties actually performed and the constitutional rights at issue. We find instructive the analysis in Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996), in which the Supreme Court rejected a simplified, label-based approach in a case involving First Amendment rights of government contractors. The Court held that a categorical rule denying independent contractors protection for the exercise of their First Amendment rights "would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." Id. at 678-79; see also O'Hare, 518 U.S. at 721-22. Given the range of duties performed by deputy sheriffs in California, a conclusion that deputy sheriffs are per se policymakers is inconsistent with important First Amendment rights as well as the analysis the Supreme Court requires under Elrod and Branti.[2]
 
 
 16
 Defendants assert that DiRuzza occupied a policymaking position because she gave open political support to the incumbent sheriff. We disagree. Political and free speech activities alone cannot make an employee a policymaker. If this were so, any employee entering the political arena to oppose re-election of the head of her office would become a policymaker and would thus be subject to retaliation. That is, the very act of engaging in political debate would result in the forfeiture of an employee's First Amendment rights. Defendants further assert that a deputy sheriff may act as a policymaker. That is true but beside the point. The actual, not the possible, duties of an individual employee determine whether political loyalty is appropriate for the effective performance of her job.
 
 
 17
 In Thomas v. Carpenter, 881 F.2d 828 (9th Cir. 1989), a sheriff's lieutenant who had run unsuccessfully against the incumbent sheriff brought a retaliation suit similar to DiRuzza's. Although the lieutenant had not been terminated, he alleged that he had been excluded "from attending departmental staff meetings, from attending policy manual revision meetings, and from participating as an evaluator for the department's high risk entry team." Id. at 829. This court reversed a dismissal under Fed. R. Civ. P. 12(b)(6), holding that
 
 
 18
 [defendant] cannot show, based solely on the allega tions of [the] complaint, that [plaintiff's ] loyalty is essential to the effective performance of the tasks removed from his list of responsibilities. . . .[Defen dant] may be able to prove at trial, or perhaps even by summary judgment, that [plaintiff's] political loy alty in each of these positions is needed for the effec tive implementation of general departmental policy.
 
 
 19
 Id. at 832. The clear import of Thomas is that there is no per se rule in this circuit based solely on job title. The critical inquiry is the job actually performed.
 
 
 20
 Quoting Hall v. Ford, 856 F.2d 255, 262 (D.C. Cir. 1988), this court outlined, in Fazio v. City and County of San Francisco, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997), several factors to consider in deciding whether political affiliation could be a job requirement:" `vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.' " Based on these factors and looking at the job actually performed, we held that Fazio, a high-ranking Assistant District Attorney for the City and County of San Francisco, was a policymaker subject to partisan dismissal. "While[Fazio's] powers are identical to those of a rank-and-file Assistant District Attorney, they are also nearly identical to those of the actual District Attorney . . . . Moreover, Fazio was paid over $100,000 per year, commented to the media about[City and County of San Francisco] cases and other cases of general public interest, and handled high profile cases with a great degree of autonomy." Id. at 1334.
 
 
 21
 Under the factors articulated in Hall and repeated in Fazio, the defendants are not entitled to summary judgment because there are material facts in dispute regarding whether DiRuzza was a policymaker subject to partisan dismissal. The Tehama County Sheriff's Department employs 78 deputy sheriffs. All of them are covered under an extensive Memorandum of Understanding between the union and the county.[3] Deputy sheriffs appear to be the lowest ranking peace officers in the department; in the Memorandum of Understanding, they are listed above secretaries and below other categories of employees such as sergeants and sheriff's detective investigators. DiRuzza asserts that she worked in positions associated with the jails during much of her time with the sheriff's department. A deputy sheriff in California who works in a custodial position in a jail is responsible for the custody, care, supervision, security, movement, and transportation of inmates, and is limited to her prescribed custodial duties. Cal. Penal Code S 830.1. According to DiRuzza and other department employees, DiRuzza spent three months assisting a lieutenant in a suit involving conditions at the jails and spent six months assigned to a jail construction project as an assistant to a sergeant. While working with the construction project, DiRuzza drafted a "policy manual" for the new jail. According to testimony of DiRuzza's superior, the drafting consisted of revising an old manual of jail procedures, such as procedures for handling inmates' mail, in order to comply with court-ordered requirements.
 
 
 22
 Under Elrod, Branti, and Fazio, there are sufficient material facts to foreclose summary judgment for defendants. Indeed, on the current state of the record, there is little to support a conclusion that DiRuzza is a policymaker. On remand, defendants have the burden of showing that DiRuzza was a policymaker and thus vulnerable to politically-based discharge. In determining whether DiRuzza was a policymaker, the district court should direct its attention to the factors outlined in Fazio, including but not limited to whether Diruzza had vague or broad responsibilities, whether she was paid an unusually high salary, whether she had the power to control others or the authority to speak in the name of the department, whether the public perceived that she had such authority, and whether she created or substantially influenced the policy of the sheriff's department.
 
 
 23
 Our holding is clearly consistent with the law in three other circuits. The Third Circuit has held that political affiliation is not an appropriate job requirement for deputy sheriffs whose primary tasks are service of process, transport of prisoners, and courtroom security. Burns v. County of Cambria, 971 F.2d 1015, 1022 (3rd Cir. 1992). That court rejected any consideration of the size of the sheriff's department and stated that, "[a]lthough loyalty and confidentiality of sheriff's deputies are desirable attributes, those traits are needed for many working relationships. It has never been suggested that the need for loyalty and confidentiality alone supports politically motivated dismissals independent of the tasks which the employee must perform." Id. at 1023. Further, the Sixth Circuit, on facts very similar to those in our case, has held that a rank-and-file deputy sheriff was not subject to patronage dismissal:
 
 
 24
 [The] defendant has failed to show that political affiliation is "an appropriate requirement for the effective performance" of [the position of deputy sheriff]. The record does not show that [the ] deputy sheriffs had the types of specific duties or responsi bilities, or the amount of discretion or policy making authority, that would make political affiliation an appropriate requirement for employment.
 
 
 25
 Hall v. Tollett, 128 F.3d 418, 429 (6th Cir. 1997). Finally, the Tenth Circuit has held that two non-sworn sheriff's department employees, one the head jailer and the other an administrative assistant, could not be terminated because of political affiliation. Dickeson v. Quarberg, 844 F.2d 1435, 1443-44 (10th Cir. 1988).
 
 
 26
 We believe that our holding is also consistent with the law of the three circuits whose cases were relied upon by the district court. In those cases, the courts of appeals held that deputy sheriffs were policymakers subject to partisan dismissal; but in each case the courts' holdings were based not simply on the job title of "deputy sheriff," but rather on an analysis of the actual job performed under that title in the states at issue. In Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997), the Fourth Circuit upheld the partisan firings of several deputy sheriffs in North Carolina. After noting that the Supreme Court had created a "narrow exception" to the otherwise applicable constitutional protection of government employees from partisan dismissal, thereby allowing patronage dismissals of those in "policymaking positions," id. at 1161, the court went on to analyze the position of deputy sheriff in North Carolina:
 
 
 27
 [W]e now consider the specific political and social roles of sheriffs and their deputies in North Carolina. . . . The North Carolina legislature has also recog nized the special status of sheriff's deputies in the eyes of the law: "The deputy sheriff has been held by the supreme Court of this State to hold an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff." The sheriff may not delegate final responsibility for his official duties, but he may appoint deputies to assist him. Our circuit and North Carolina state courts agree that the sheriff can be held liable for the misbehavior of his deputies. Pre sumably it is for these reasons that the legislature has made deputies at-will employees who "shall serve at the pleasure of the appointing officer."
 
 
 28
 Id. at 1163-64. The court specifically limited its holding, noting that "courts examine the job duties of the position, and not merely the title, of those dismissed." Id. at 1165.
 
 
 29
 In Upton v. Thompson, 930 F.2d 1209 (7th Cir. 1991), the Seventh Circuit upheld partisan firings of deputy sheriffs in Illinois. After recognizing that under Supreme Court law only employees holding policymaking positions could be fired for partisan reasons, id. at 1213, the court analyzed the actual nature of the job performed by deputy sheriffs in Illinois and concluded that deputy sheriffs were policymakers. Among other things, the court specifically noted that"[a] deputy sheriff in implementing the Sheriff's basic policy, will`make some decisions that will actually create policy.' " Id. at 1215 (quoting Livas v. Petka, 711 F.2d 798, 801 (7th Cir. 1983)).
 
 
 30
 Finally, in Terry v. Cook, 866 F.2d 373 (11th Cir. 1989), the Eleventh Circuit upheld the partisan firing of deputy sheriffs in Alabama. The court applied the Elrod-Branti test of whether "political loyalty is an appropriate requirement for employment," and analyzed the nature of the job of deputy sheriff in Alabama in upholding a Rule 12(b)(6) dismissal of claims brought by deputy sheriffs who had been fired:
 
 
 31
 Under Alabama law, a deputy sheriff is the general agent of and empowered to enter into business trans actions for the sheriff. Any transaction within the scope of the sheriff's duties may be acted upon by his deputy. The deputy sheriff is the alter ego of the sheriff, and the sheriff is civilly liable for actions committed by a deputy in the performance of his duty . . . . The closeness and cooperation required between sheriffs and their deputies necessitates the sheriff's absolute authority over their appointment and/or retention.
 
 
 32
 Id. at 377 (citations omitted). Significantly, the court in Terry reversed a Rule 12(b)(6) dismissal of claims brought by other employees, including "jailers," for the same partisan firing:
 
 
 33
 It has not been established that loyalty to an individ ual sheriff is an appropriate requirement for effective job performance for the remaining positions of clerk, investigator, dispatcher, jailer, and process server. This is a determination that depends upon the actual responsibilities of each position and the relationship of each to the sheriff.
 
 
 34
 Id. at 377-78.
 
 
 35
 The district court thus erred in granting summary judgment based on a holding that deputy sheriffs in California are policymakers and may be fired for the exercise of their first amendment rights. While it is possible that some deputy sheriffs in California may be policymakers, an analysis of an individual deputy's actual duties is necessary to that determination. On the record before us, there are material facts in dispute regarding the duties actually performed by DiRuzza and whether these duties made her a policymaker. We therefore remand for an individualized determination of whether DiRuzza was a policymaker for whom political affiliation was a reasonable requirement.
 
 B. Qualified Immunity
 
 36
 Defendants Heard and Floyd contend that even if DiRuzza was protected against retaliation, they are nonetheless entitled to qualified immunity insulating them from damage judgments. Government officials who perform discretionary functions are entitled to qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This test necessitates a two-part analysis:"(1) whether the law governing the official's conduct was clearly established, and (2) whether, given this clearly established standard, a reasonable official could believe that his or her conduct was lawful." Biggs v. Best, Best & Krieger, 189 F.3d 989 (9th Cir. 1999); see also Ortega v. O'Connor, 146 F.3d 1149, 1154 (9th Cir. 1998). A decision regarding qualified immunity is reviewed de novo. Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991). While the plaintiff bears the burden of proof regarding whether the right is clearly established, a defendant must prove that his or her conduct was reasonable. Id.
 
 
 37
 For purposes of determining qualified immunity, the law must be clearly established at the time of the defendant's acts. In this case, the alleged retaliation occurred in 1995. The test for determining whether a law is clearly established "requires more than an alleged violation of extremely abstract rights." Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir. 1988) (citations omitted).
 
 
 38
 The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be appar ent.
 
 
 39
 Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted).
 
 
 40
 Under Elrod and Branti, decided by the Supreme Court in 1976 and 1980, and under Ninth Circuit case law decided prior to 1995, it was clearly established that a nonpolicymaking public employee in a sheriff's office is protected from retaliation for the exercise of First Amendment rights. While neither the Supreme Court nor this court has previously ruled on deputy sheriffs in Tehama County, such a ruling is not necessary. Elrod, the initial Supreme Court decision creating the policymaking exception, involved a sheriff's department. The Court, in defining the right of certain employees to be free from retaliation for the exercise of First Amendment expression in that case, stated that "the nature of the responsibilities is critical." Elrod, 427 U.S. at 367. The Supreme Court in Branti went on to clarify that the proper inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. In 1989, this court in Thomas held that a lieutenant in a sheriff's office was not necessarily a policymaker, see 881 F.2d at 832, and that the defendant had failed to show that "political loyalty is essential to the effective performance of the tasks removed from his list of responsibilities." Id.
 
 
 41
 It was thus clearly established, at the time defendants acted, that deputy sheriffs were not per se policymakers in California.[4] It was clearly established, asa matter of law, that the actual duties performed by a deputy sheriff determined whether he or she was a policymaker and therefore subject to partisan dismissal, or a non-policymaker and therefore protected from such dismissal. The record made so far in this case does not make clear whether DiRuzza's job actually entailed policymaking and, thus, whether she could be fired for partisan reasons. This lack of clarity, however, does not support Floyd's and Heard's claim of qualified immunity. The fact that the specifics of DiRuzza's job duties are unclear to the court on the current state of the record, does not mean that Heard and Floyd did not know those specifics at the time they acted.
 
 
 42
 For purposes of summary judgment on the question of qualified immunity, as well as on all other issues, we must presume the facts to be those most favorable to the nonmoving party. See Liston v. County of Riverside, 120 F.3d 965, 977 (9th Cir. 1997). Accepting DiRuzza's view of the facts as correct and drawing all reasonable inferences in her favor, she was not a policymaker, and that fact would have been well known to both Heard and Floyd. We need not speculate here on the merits of the qualified immunity argument under the facts that might be developed at trial.
 
 C. Retaliation
 
 43
 The district court did not reach the question whether defendants Heard and Floyd retaliated against DiRuzza for the exercise of her First Amendment rights. Defendants claim that their acts were motivated not by her political expression but, rather, by her unlawful discharge of a firearm. While we may affirm a grant of summary judgment on grounds other than those relied upon by the district court, Gemtel Corp. v. Community Redevelopment Agency of the City of Los Angeles, 23 F.3d 1542, 1546 (9th Cir. 1994), we decline to do so here because there are disputed facts material to the question of retaliation that preclude summary judgment. In Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), the Supreme Court articulated the standard for determining when retaliation for protected First Amendment conduct is an impermissible factor in a decision to take adverse action. The burden initially rests on the plaintiff to show that the conduct at issue was a motivating factor in the defendant's action. The burden then shifts to the defendant to show by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." Id. at 287.
 
 
 44
 In our case, there are disputed material facts regarding whether defendants took adverse job action against DiRuzza and whether political retaliation was a substantial or motivating factor. DiRuzza was involved in a violent disagreement with her fiance and fired eight rounds from her service revolver out her bedroom window. DiRuzza explains the incident by saying that her fiance was threatening her with a rifle and that she was attempting to get the neighbors to call the authorities. The matter was submitted to the district attorney, and it is undisputed that DiRuzza was suspended for thirty days under then-Sheriff Blanusa. However, the facts are disputed concerning the influence of defendants Heard and Floyd on the subsequent actions taken by the district attorney. Plaintiff relies upon declarations and depositions stating that defendants influenced the district attorney's decision to continue to pursue the case and to offer the plea bargain that resulted in DiRuzza's job loss, and that this influence was motivated by a desire to retaliate against DiRuzza for herpolitical support of the incumbent Sheriff. Parker Decl. 3:24 to 4:2; Groves Dep., 23:14 to 28; Welsh Decl. P 3-5. We believe that this evidence is enough to foreclose a grant of summary judgment for defendants. See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310 (9th Cir. 1989) (liability depended upon the defendant's motivation, which was a genuine issue of material fact precluding summary judgment); Allen v. Scribner, 812 F.2d 426 (9th Cir. 1987) (two affidavits of co-workers sufficient evidence to indicate that the protected expression was a substantial factor in the disciplinary action, thus precluding summary judgment); Gilbrook v. City of Westminster, 177 F.3d 839, 855 (9th Cir. 1999) (Mt. Healthy analysis is an intensely factual determination of motivation and causation).
 
 III
 
 45
 We hold that the district court erred in finding categorically that deputy sheriffs in California are policymakers and reverse the grant of summary judgment to defendants Heard, Floyd, and Tehama County. We further hold that the district court erred in granting summary judgment to defendants Heard and Floyd on grounds of qualified immunity. Finally, we hold that there are material facts in dispute regarding Heard's and Floyd's alleged retaliation against plaintiff.
 
 
 46
 Because the district court found no constitutional injury to DiRuzza, it granted summary judgment to defendant Tehama County without reaching questions of liability specific to the county. We leave it the district court to address such questions, as appropriate, on remand. Further, after dismissing DiRuzza's federal claims, the district court declined to exercise supplemental jurisdiction over her state claims under 28 U.S.C. S 1367(c). We leave it to the district court to reinstate and decide those claims, as appropriate, on remand.
 
 
 47
 We therefore REVERSE the summary judgment granted to defendants and REMAND for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Although the Seventh Circuit has held that a deputy sheriff may be terminated for political reasons, a deputy may not be retained and then subjected to a campaign of retaliatory harassment. See Wallace v. Benware, 67 F.3d 655, 664 (7th Cir. 1995). In Wallace, the campaign of harassment was severe, including actions at the scene of a crime that threatened the plaintiff's life. Id. at 658.
 
 
 [2]
 This case does not involve the other line of analysis set forth in Pickering and Connick, where speech on matters of public concern must be evaluated in terms of the effect on the government's efficient management of its operations. See Pickering, 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138 (1983). Defendants do not assert that DiRuzza's speech and political activities had an effect on the working relationships in the office or on the efficient operation of the sheriff's department that would justify limiting her First Amendment rights.
 
 
 [3]
 We take judicial notice the Memorandum of Understanding entered into between the County of Tehama and the Tehama County Law Enforcement Officers Bargaining Unit pursuant to Federal Rule of Evidence 201 and Papai v. Harbor Tug and Barge Co., 67 F.3d 203, 211 fn.5 (9th Cir. 1995), rev'd on other grounds, 540 U.S. 548 (1997).
 
 
 [4]
 The dissent contends that the right of a non-policymaking public employee to be free from retaliation was not clearly established in 1995, the date of the actions at issue in this case, because Fazio v. City and County of San Francisco was decided by this circuit in 1997. This would be a telling point if Fazio had broken new ground. Fazio, however, was an obvious application of an already-established rule. Elrod and Branti, decided by the Supreme Court in 1976, and 1980, and Thomas, decided by this circuit in 1989, all clearly held that non-policymaking employees are protected from retaliatory discharge based on the exercise of First Amendment rights.
 
 
 O'SCANNLAIN, Circuit Judge, dissenting:
 
 48
 Today, the court holds a sheriff and an undersheriff responsible, ex post facto, for legal rules that did not exist at the time they acted. Because it would be wrong to hold these law enforcement officers to standards which the court's analysis reveals it cannot meet itself, I respectfully dissent.
 
 
 49
 * A sheriff's office "would be unmanageable if its head had to . . . retain his political enemies . . . in positions of confidence or positions in which they would be . . . exercising discretion in the implementation of policy." Fazio v. City and County of San Francisco, 125 F.3d 1328, 1333 (9th Cir. 1997) (quotations omitted). Thus judges must be careful before interpreting the Constitution to place such a heavy burden on public employers. I agree with the court that in this circuit deputy sheriffs are not per se policymakers. I agree that the inquiry must be fact-specific. But I cannot agree with the court's misreading of the case law, a misreading that threatens to place heavy burdens on public officials forced to implement, through politically disloyal employees, policies the public elected them to enact.
 
 
 50
 We simply do not have sufficient information in the record to determine whether DiRuzza was a policymaker who could be fired after publicly campaigning for the sheriff's electoral rival. The district court did not inquire into this because it relied on out-of-circuit cases to conclude that deputy sheriffs are per se policymakers. Moreover, DiRuzza has presented little evidence of her job responsibilities under Sheriff Blanusa, describing instead her limited responsibilities after Sheriff Heard took over. Thus, were I not to conclude that the defendants are qualifiedly immune, I would simply remand the case to the district court so that it could determine whether DiRuzza's authority and responsibilities made her a policymaker. With the utmost respect, but because the court, inmy view, mischaracterizes the facts and the applicable law, I must dissent to its analysis. I would affirm the district court's holding that Sheriff Heard and Undersheriff Floyd were entitled to qualified immunity.
 
 II
 
 51
 I agree with the court that Thomas v. Carpenter, 881 F.2d 828 (9th Cir. 1989), precludes any per se rule that deputy sheriffs are policymakers and that we must proceed to the analysis we laid out in Fazio. 125 F.3d at 1334 n.5.[1] To determine, then, whether political loyalty is a reasonably appropriate requirement for an employee in DiRuzza's position we consider her responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policy makers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders. See id. We should do so mindful of the admonition in Fazio that "a public employee need not literally make policy in order to fit within the Elrod policymaker exception." Id. at 1332.
 
 
 52
 First, the position of deputy sheriff has the broadest and vaguest of responsibilities. Under California law, "both the general statutes and decisional law establish that[deputy sheriffs] possess[ ] all of the powers and may preform all of the duties attached by law to the office of sheriff." People v. Woods, 7 Cal. App. 3d 382, 385 (1970); see also Cal. Gov't Code S 24100. As such they are charged broadly with "preserv[ing] peace." See Cal. Gov't Code S 26600. DiRuzza need not regularly exercise these powers in order to qualify as a policymaker. See Fazio, 125 F.3d at 1333 (citing Mummau v. Ranck, 687 F.2d 9 (3d Cir. 1982) (holding that an assistant district attorney (ADA) who only prosecuted juvenile cases and was not involved in the policymaking details of the office was a policymaker because regardless of whether the ADAs actually exercised all their powers, the powers granted to ADAs were broad)). "So long as the applicable statute, regulations and case law contemplate that the public officer might be relied upon to . . . implement[ ] policy the official may be fired for political reasons without offending the First Amendment." Id. (quotations omitted); see also Dickeson v. Quarberg, 844 F.2d 1435, 1442 (10th Cir. 1988) ("We focus on the inherent powers of the positions as well as on the actual duties performed). As a deputy sheriff, DiRuzza potentially enjoyed broad power, but the record does not contain sufficient information regarding her specific responsibilities to allow us to determine the duties she actually performed.
 
 
 53
 Second, DiRuzza's technical competence appears to be quite high. She has been chosen at least twice for extensive assignments relating to prison policy. The majority leaps from the fact that she has worked in positions associated with the jails to the conclusion that she worked in a "custodial position" in which her duties were limited to the care of prisoners. Supra at 1311. But the record reveals that DiRuzza's responsibilities were far more expansive. She first worked on a "Federal litigation project" assisting at depositions and at trial. Later, the sheriff appointed her as the number two deputy on the jail construction project, charging her with revising the policy manual for prison procedures. The majority's dismissive account of her responsibilities in this role betrays its own deaf ear to precedent instructing us that a policy maker need not literally make policy. See Fazio, 125 F.3d at 1332. DiRuzza was chosen for this second position precisely because of the technical competence and expertise she had acquiredwhile working on the federal prison litigation. Determined not to allow a repetition of the poor policies and procedures which had led to the federal litigation, Sheriff Blanusa put DiRuzza in charge of drafting a new policy manual which would ensure that the prison complied with all of the pertinent laws.
 
 
 54
 Third, DiRuzza had extensive contact with and had to be responsive to elected officials, most obviously the elected sheriff, to whom she answered directly. As deputy sheriff, DiRuzza was responsible for implementing the policies of this elected official. While working, "sheriff's deputies are often called upon to make on-the-spot split-second decisions effectuating the objectives and law enforcement policies which a particular sheriff has chosen to pursue." McBee v. Jim Hogg County, 703 F.2d 834, 839 (5th Cir. 1983), vacated on other grounds, 730 F.2d 1009 (5th Cir. 1984) (en banc). In rural Tehama County a deputy sheriff has wide latitude and discretion in implementing the sheriff's policies while on patrol. In fact her authority and responsibilities continued even when she was not on duty. See Melendez v. City of Los Angeles, 63 Cal. App. 4th 1, 8-9 (1998). While the sheriff generally is responsible for developing policy, DiRuzza "may, in carrying out [her] duties, make some decisions that will actually create policy." Fazio, 125 F.3d at 1332 (quotations omitted).
 
 
 55
 Fourth, the public would reasonably perceive that the uniformed deputy sheriff speaks for the sheriff. "In order to promote public confidence in law enforcement, the Sheriff depends on his deputies to publicly project his competence and the competence of the office." Upton v. Thompson, 930 F.2d 1209, 1215 (7th Cir. 1991). In the prison and on the beat she was the face and voice of the sheriff and his policies.
 
 
 56
 Thus, on remand, and with the benefit of more evidence, the district court may well conclude that DiRuzza's responsibilities in her position of deputy sheriff indicate the need for her political loyalty " `not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.' " Thomas, 881 F.2d at 831 (quoting Elrod, 427 U.S. at 367). Fewer acts convey greater opposition to an elected supervisor's policies than actively campaigning for a rival candidate.[2] Unlike the plaintiffs in Elrod and Branti, DiRuzza does not allege that Sheriff Heard retaliated against her merely for belonging to the wrong political party.[3] The court's misapplication of the law and its characterization of the facts would force a sheriff to implement his policies through, and to entrust the enforcement of his programs, to a policymaking deputy who actively campaigned against these policies and programs by appearing in television commercials for his opponent.
 
 III
 
 57
 More troubling, the court holds that Sheriff Heard and Undersheriff Floyd cannot benefit from qualified immunity because they violated Deputy Sheriff DiRuzza'sclearly established rights. Despite the fact that the Supreme Court's reasoning in this area has shifted, that the circuits are split on the question, and that the four Article III judges who have examined the very question in this case are equally divided on whether the First Amendment protects DiRuzza's disloyalty, the court concludes that the Sheriff and Undersheriff could have known in 1995 that DiRuzza had a clearly established right not to be fired under these circumstances.
 
 
 58
 Even if Sheriff Heard and Undersheriff Floyd improperly fired DiRuzza for her support of then-Sheriff Blanusa, they may only be held liable if, at the time they acted, the "law governing [their] conduct was clearly established" and if "given this clearly established standard, a reasonable official could believe that his or her conduct was lawful." Biggs, v. Best, Best & Krieger 189 F.3d 989, 994 (9th Cir. 1999) (citation omitted). "A right is `clearly established' if `the contours of [that] right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " B.C. v. Plumas Unified School District, 192 F.3d 1260, 1268 (9th Cir. 1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "To show that the right in question here was clearly established, [DiRuzza] need not establish that [Heard's and Floyd's] behavior had been previously declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law." Id. (quotations and citations omitted).
 
 
 59
 The question then is whether "the contours of[DiRuzza's] right were sufficiently clear" when Sheriff Heard and Undersheriff Floyd acted in 1995 that "a reasonable official would [have understood] that what he [was] doing violate[d] that right." Id. No one could disagree that by 1995, the time the defendants acted, it was clearly established that a nonpolicymaking public employee is protected from political retaliation. But this begs the question. Rather, we must ask whether the defendants could have known that a deputy sheriff with DiRuzza's job responsibilities was a nonpolicymaking employee. The district court got it right: they could not have.
 
 
 60
 Recall that, Thomas, decided in 1989, held that political loyalty is not necessarily a job requirement in a sheriff's office. This case, however, was decided on a motion to dismiss and the court explicitly left open the possibility that a defendant could establish at the summary judgment stage that loyalty is necessary for the position. Thomas, therefore, cannot stand for the proposition that it was clearly established that a deputy sheriff with DiRuzza's responsibilities was not a policymaker. Because Thomas does not clearly establish that DiRuzza was a policymaker, it cannot be said that this rule was clearly established at the time the defendants acted. After Thomas, and before 1995, there simply were no other Ninth Circuit cases to give the defendants guidance on who was and who was not a policymaking employee. Most revealing is the majority's extensive reliance on Fazio, a case decided two years after the defendants acted. Although the majority is careful to avoid citing it in Part B of its decision, to reach the conclusion in Part A that DiRuzza was not a policymaker on these facts, it had to rely heavily on the Fazio factors. Fazio, however, was decided in 1997, two years after Sheriff Heard's actions, and thus cannot be construed against him. If the right had been clearly established by 1995, then presumably the majority could have concluded in Part A that DiRuzza was not a policymaker without ever discussing Fazio. In reaching its conclusion by leaning so heavily on Fazio, the majority holds Sheriff Heard and Undersheriff Floyd (who could not have been aware of that decision) to a standard of legal reasoning it cannot meet itself. "Given such an underdeveloped state of the law, the officers in this case cannot have been expected to predict the future course of constitutional law." Wilson v. Layne, U.S. , 119 S.Ct. 1692, 1701 (1999).[4]
 
 
 61
 The Supreme Court's splintered and shifting jurisprudence in this area of the law provides the backdrop for the conclusion that it was not clearly established when the defendants acted that DiRuzza was a protected non-policymaker. In Elrod v. Burns, 427 U.S. 347 (1976), the first case fashioning such a rule, no rationale could command a majority of the justices. Then in Branti v. Finkel, 445 U.S. 507 (1980), the Court shifted the "ultimate inquiry . . . [from] whether the label `policymaker' or `confidential' fits a particular position" to whether political loyalty "is an appropriate requirement for the effective performance of the public office involved." Id. at 518. This formulation of the inquiry caused Justice Stewart who had concurred in Elrod to dissent in Branti. See id. at 520 (Stewart, J., dissenting). Finally, in O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996), the Supreme Court cast doubt on the rationale underlying the application of the First Amendment to this area and rephrased the standard, shifting from whether political loyalty is essential or needed to whether it is "reasonably appropriate." 518 U.S. at 712.[5]
 
 
 62
 The lack of clear direction from the Supreme Court in this area has lead to a circuit split on the precise issue before us. As the majority notes, three circuits have upheld the legality of politically motivated dismissals of deputy sheriffs on the ground that they are policymakers. See Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997) (en banc); Upton, 930 F.2d at 1218 (7th Cir.); Terry v. Cook, 866 F.2d 373 (11th Cir. 1989). On the other hand, at least two circuits have held that employees in such positions are not policymakers, see Burns v. County of Cambria, 971 F.2d 1015 (3rd Cir. 1992);[6] Hall v. Tollett, 128 F.3d 418 (6th Cir. 1997),[7] yet another that determining the applicability of First Amendment protection requires a fact-specific balancing test, see McBee v. Jim Hogg County, 730 F.2d 1009 (5th Cir. 1984) (en banc). Justice Powell predicted this confusion in Branti."The standard articulated by the court is framed in vague and sweeping language certain to create vast uncertainty. Elected and appointed officials at all levels . . . no longer will know when political affiliation is an appropriate consideration in filling a position." 445 U.S. at 524 (Powell, J., dissenting); see also Rutan v. Republican Party of Illinois, 497 U.S. 62, 111-113 & nn. 5-21 (1990) (Scalia, J., dissenting) (listing the many conflicting cases regarding which government positions are protected from politically motivated dismissal to illustrate the "inconsistent and unpredictable results").Nevertheless, peering through all of this legal fog and the nearly unfathomable variations of fact-specific analyses, the majority discerns that Sheriff Heard and Undersheriff Floyd could have known in 1995 that they could not fire Deputy Sheriff DiRuzza for campaigning against him.
 
 
 63
 For my part, I simply cannot agree that "the only reasonable conclusion from binding authority [was] that the disputed right existed . . . [such that the Tehama County sheriff and undersheriff] would be on notice of the right, and [are not] qualifiedly immune [when] they acted to offend it." B.C., 192 F.3d at 1268 (quoting Blueford v. Prunty, 108 F.3d 251, 255 (9th Cir. 1997)). The tests for determining when political loyalty is an appropriate requirement are "so general that for most positions it is impossible to know whether party affiliation is a permissible requirement until a court renders a decision." Rutan, 497 U.S. at 111 (Scalia, J., dissenting). Today's case proves the point. The four Article III judges who have examined this question have reached three different conclusions and two different results. One, the district court judge, ruled that DiRuzza was a policymaker. The three judges on this panel have now held that we do not know enough to decide, but only reached this result after conducting two significantly different analyses of the case law, including a pivotal case that did not even exist when the defendants acted. "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." Wilson, 119 S.Ct. at 1701. Given this level of confusion, "[e]ach of[the] defendants could `have believed that [his] conduct was lawful.' " B.C., 192 F.3d at 1268 (quoting Jensen v. City of Oxnard, 145 F.3d 1078, 1086 (9th Cir. 1998)). As no case law by 1995 clearly established that the Constitution protected Deputy DiRuzza's political disloyalty, I would affirm the district court's decision that the defendants are qualifiedly immune.
 
 IV
 
 64
 Qualified immunity protects all but the plainly incompetent and the willful violators of the law. A public official should not be held to such high standards of clairvoyance that he is civilly liable for failing to comply with legal authority that did not even exist when he acted. I must respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 I use the term "policymaker" only as shorthand for a position in which political loyalty may reasonably be required. I am mindful of the Supreme Court's instruction that "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518.
 
 
 [2]
 "We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign against the candidate's opponent." Jenkins v. Medford, 119 F.3d 1156, 1164-65 (4th Cir. 1997) (en banc); cf. Wilbur v. Mahan, 3 F.3d 214, 218 (7th Cir. 1993) ("The declaration of candidacy in these circumstances is a declaration of war."); Upton, 930 F.2d at 1218 ("This contrasts sharply with the politically active deputy who, by vociferously campaigning for the loser, encounters Matthew 26:52: `All they that take the sword shall perish with the sword.' ")
 
 
 [3]
 " `If a public official is permitted to fire a confidential or policymaking employee merely because the latter quietly, inoffensively, undemonstratively belongs to the wrong political party . . . the official should be permitted to fire the same employee when the latter asks the electorate to the throw the rascal out . . . .' " Fazio, 125 F.3d at 1332 (quoting, Wilbur, 3 F.3d at 218).
 
 
 [4]
 Contrary to the majority's assertion in its note 4, I do not suggest that Fazio decided for the first time that a non-policymaking employee is protected from retaliation; rather, as the majority's reliance on the case implicitly acknowledges, Fazio is the first case which would allow defendants to determine whether a deputy with DiRuzza's job responsibilities was a policymaking employee.
 
 
 [5]
 "It was by no means self-evident whether our First Amendment precedents applied, for as Justice Powell explained in dissent, the patronage practices at issue had been sanctioned by history and had been thought by some to contribute to the effective operation of political parties. If indeed those patronage practices fortify the party system, they may serve important First Amendment interests, since parties promote and generate political discourse." O'Hare, 518 U.S. at 717-18 (citations omitted).
 
 
 [6]
 This case does not support the majority's conclusion as much as the majority implies because the extent of the responsibilities of the deputy sheriff in this case was limited to serving process, transporting prisoners and providing court security. Burns, 971 F.2d at 1022. DiRuzza's responsibilities and powers were far more extensive.
 
 
 [7]
 Contrary to the majority's assertion, its holding is not consistent with Dickeson v. Quarberg, 844 F.2d 1435 (10th Cir. 1988). The plaintiffs in Dickeson were a non-deputized head jailer who job was "housing and feeding prisoners" and a non-sworn administrative assistant whose job was "essentially secretarial." Id. at 1437, 1443 & n.7. Thus the case is not analogous to this one.