Nelson WALKER, Plaintiff,

and

Fair Housing Foundation of Long Beach, Counter-claimant-Appellant,

v.

CITY OF LAKEWOOD, a California Municipality, Defendant-Appellee.

No. 00–55060.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 2001

Filed Aug. 31, 2001

Amended Nov. 1, 2001

Barrett S. Litt, Litt & Marquez, Los Angeles, California, for the counter-claimant-appellant.

Kristin A. Pelletier and Richard R. Terzian, Bannan, Green, Frank, & Terzian, Los Angeles, California, for the defendant-appellee.

Krista Macnevin Jee, Law Office of Richard D. Jones, Fullerton, California, for the amici curiae.

Before: NOONAN, SILVERMAN, and PAEZ, Circuit Judges.

### ORDER DENYING PETITION FOR REHEARING/AMENDING OPINION AND AMENDED OPINION

PAEZ, Circuit Judge:

## ORDER

The panel has voted unanimously to deny Defendant and Appellee City of Lakewood's petition for rehearing. Judges Silverman and Paez have voted to deny the petition for rehearing en banc, and Judge Noonan so recommends.

The full court has been been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it. Fed. R.App. P. 35(b).

The petition for rehearing and rehearing en banc is DENIED.

The opinion filed August 31, 2001, is hereby AMENDED as follows:

1. Footnote 4 on page 12030 of the slip opinion is deleted.

2. The two sentences on page 12033 of the slip opinion, "The City supervised the organization more closely than it had before, by sending city officials to monthly meetings; asked the FHF to 'curtail the amount of exposure' it gave discrimination complaints; and contacted other cities to complain about the FHF. Additionally, the City filed suit against the FHF for breach of contract, which required time and money to defend.", are deleted and replaced with the following two new sentences: "The City supervised the organization more closely than it had before, by sending city officials to monthly meetings, and also asked the FHF to 'curtail the amount of exposure' it gave discrimination complaints. Additionally, the City contacted other cities to complain about the FHF and also filed suit against the FHF for breach of contract, which required time and money to defend.5"

3. The following footnote number 5 is added at the end of the second new sentence: "5 The City's right to engage in these types of activities may be protected under the Noerr–Pennington doctrine, named after the two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The *Noerr–Pennington* doctrine was originally developed to protect companies who lobbied the government or who sought redress from the courts from liability under the Sherman Act. *See, e.g., Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ('Those who petition government for redress are generally immune from antitrust liability.'). This doctrine has been extended beyond its original context, and may be invoked in at least some limited cases by governmental entities, *Manistee Town Ctr. v. City of Glendale,* 227 F.3d 1090, 1094 (9th Cir.2000) (holding that city may invoke *Noerr–Pennington* defense to protect lobbying of county government)".

"But even if we were to apply *Manistee* to the City's alleged conduct in this case, the City's third-party suit against the FHF would not be protected activity under the Noerr–Pennington doctrine if it was 'objectively baseless.' *Prof'l Real Estate Investors,* 508 U.S. at 60, 113 S.Ct. 1920. In addition, the City's communications with other cities regarding FHF must constitute 'petitioning' within the meaning of *Manistee. Manistee,* 227 F.3d at 1093–94. It is not clear from this record whether these standards are met and, therefore, whether the City ought to be able to claim a Noerr–Pennington defense with regard to these two types of conduct. Because

there are genuine issues of fact regarding the City's alleged retaliatory conduct, we leave these issues for the district court to resolve on remand. With regard to the other allegedly retaliatory conduct, the doctrine does not apply and the City has no Noerr–Pennington defense."

## OPINION

This case presents the question of when an independent fair housing services provider engaged in advocacy efforts may sue the city with whom it contracts for retaliating against the provider in response to that advocacy. We hold that, as a general matter, retaliation against independent providers can be actionable under the federal Fair Housing Act, 42 U.S.C. § 3617, and the California Fair Employment and Housing Act, Cal. Gov't Code § 12955.7, and that, in this case, the Fair Housing Foundation of Long Beach's claims should have survived summary judgment. We remand those retaliation claims to the district court for further proceedings. However, we also hold that, under the circumstances in this case, the Fair Housing Foundation cannot state a claim under 42 U.S.C. § 1983 for retaliation against First Amendment activities.

### FACTUAL BACKGROUND

Pursuant to its contract with the City of Lakewood ("City"), the Fair Housing Foundation of Long Beach ("FHF") operated a fair housing counseling program for the City. On September 2, 1992, a group of tenants and former tenants of the Park Apartments complex in Lakewood (the "Park Tenants" or "Park Plaintiffs") contacted the FHF, alleging that the Park Apartments management company was engaged in racial discrimination and harassment. After being presented with their various options, the Park Tenants request-

ed referral to a private attorney. The FHF contacted the law firm of Traber, Voorhees & Olgun within a matter of days after first meeting with the Park Tenants. On July 29, 1993, the FHF advised the City that the residents of the Park Apartments were going to file a lawsuit against the owners and managers of the complex and that a press conference was going to be held at the FHF's offices on the following day. The FHF provided the City with a copy of the press release and a "case narrative," outlining the history of the anticipated litigation. The press release included the following statement by the FHF Executive Director, Barbara (Mowery) Shull, about the alleged discrimination at the Park Apartments:

> This case illustrates why it is critical for apartment owners and managers to receive training in how to provide fair housing. While many of these families had lived for years in this complex without problem, it only took one ignorant and biased manager a few months to uproot and displace at least eight or nine such families and to send the message to yet another generation of young African–Americans that they are still not welcome in middle class cities like Lakewood.

The City contends that this statement accused it of racism.

The Park Tenants filed suit on July 30, 1993. Claiming unlawful eviction, harassment, and other discrimination based on race and familial status, the plaintiffs alleged violations of the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601—3619, 3631; the California Fair Employment and Housing Act ("FEHA"), Gov't Code §§ 12955—12956.1; the Unruh Civil Rights Act, Cal. Civil Code § 51, 52(a); and the California Business and Professions Code § 17200; as well as negligent hiring, training, and/or supervision, and intentional infliction of emotional distress. The underlying action was resolved by a consent decree approved by then-District Judge Wardlaw on April 2, 1997.

In the meantime, on August 4, 1993, Scott Barker, Vice President of the Park Apartments' management company and a named defendant in the Park lawsuit, sent a letter to City officials complaining about the lawsuit and the FHF's investigation and aiding of the Tenants. Barker asked the City officials to "[p]lease review the policies of the Foundation and ask them to truly investigate claims prior to making statements in the newspaper." The top of the letter had a handwritten note saying, "We will be responding to this request!- Jack G." Jack Gonsalves is Assistant Director of Community Development for the City. On August 17, 1993, Charles K. Ebner, the City's Director of Community Development, sent a letter to the FHF requesting a meeting to discuss "possible contract violations." Ebner wrote the FHF a second letter, on September 23, 1993:

> We believe FHF exercised poor judgement concerning the press release and conference in The Park apartments case.... The handling of The Park apartments case, and in particular the press conference, leaves us with serious concerns for the future.... Quite frankly we are looking for some assurance on the part of FHF that a similar scenario will not occur in the future and that you will have more regard for the community of Lakewood.

The FHF replied with a letter dated September 26, 1993, in which it informed the City that it was considering joining the Park Tenants suit as a plaintiff and that it was common practice for fair housing organizations to participate in press conferences, and expressed concern because the City's Housing Specialist, Michelle (Mitchell) Ramirez, had told Barbara Shull that the FHF would not be paid until it apolo-

gized. In a November 4, 1993, letter Ebner disputed the nature of the conversation between Ramirez and Shull:

> Ms. [Ramirez], in fact, simply informed Ms. [Shull] that the City was waiting for a response from the FHF before releasing payment for those months. The City's interest is in resolving any problems with the FHF and receiving some assurance on the part of FHF that a similar scenario will not occur in the future and that you will have more regard for the community of Lakewood.

The November letter included the back payments that the City owed the FHF.

Then–District Judge Tashima denied the FHF's request to join the underlying action as a co-plaintiff, but granted the Park Tenants' request to join the City and the Los Angeles County Sheriff's Department as defendants.

Although the City had renewed the FHF's contract from 1990 to 1993 without requiring the FHF to submit a new bid each year, the City sent out requests for proposals to various fair housing organizations to replace the FHF. The City did not ask the FHF for a bid. Only the Fair Housing Council of San Bernardino and the FHF, which submitted a bid despite not receiving a request, submitted proposals. The FHF alleges it was excluded from consideration, and the San Bernardino organization was chosen to receive the 1994–95 contract.

The City filed a third-party complaint against the FHF and Shull for breach of contract and indemnity. In response, the FHF filed this counterclaim against the City, alleging interference and retaliation, in violation of the FHA, the FEHA, and the First Amendment. Judge Tashima dismissed the complaint against Shull and the breach of contract claim against the FHF. On May 17, 1999, District Judge Tevrizian granted summary judgment for the FHF on the City's indemnity claim and for the City on the FHF's state and federal fair housing claims. The district court held that the FHF did not have standing to sue under the FHA because the contract between the parties governed the FHF's legal obligations and contemplated termination of the relationship. The district court also held that the FHF did not have standing under the FEHA because that statute does not extend protection to independent contractors. On October 18, 1999, the district court also granted summary judgment for the City on the FHF's First Amendment retaliation claim. The district court held that, because of its confidential and policymaking position, the FHF was not entitled to First Amendment protection. The FHF now appeals. We have jurisdiction under 28 U.S.C. § 1291. We affirm the summary judgment on the § 1983 claim, but reverse the summary judgment on the FHA and FEHA retaliation claims.

## STANDARD OF REVIEW

■ Standing is a question of law reviewed de novo. *Stewart v. Thorpe Holding Co. Profit Sharing Plan,* 207 F.3d 1143, 1149 (9th Cir.2000); *San Pedro Hotel, Inc. v. City of Los Angeles,* 159 F.3d 470, 474–74 (9th Cir.1998).

■ A grant of summary judgment is also reviewed de novo. *Botosan v. Paul McNally Realty,* 216 F.3d 827, 830 (9th Cir.2000). We apply the same standard as the trial court under Federal Rule of Civil Procedure 56(c). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

## DISCUSSION

### A. STANDING UNDER THE FHA AND FEHA

█ The Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person ... on account of his having aided or encouraged any other person in the exercise or enjoyment of[ ] any right granted or protected by" the Act. 42 U.S.C. § 3617. The FHF alleges that the City violated § 3617, as well as the analogous state law, the FEHA, Cal. Gov't Code § 12955.7, by retaliating against the organization for its involvement in the Park Tenants' lawsuit.[1]

At the outset, we consider whether the FHF has standing to bring retaliation claims under the FHA and FEHA. Because it meets the minimal requirements of Article III of the Constitution, we hold that it has standing.

### 1. LEGAL STANDARD

█ In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court reaffirmed that " 'Congress intended standing under [the FHA] to extend to the full limits of Art[icle] III' and that courts accordingly lack the authority to create prudential barriers to standing in suits brought under that [statute]." (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). Accordingly, courts do not have the authority to create and apply new standing requirements, as the district court did here in imposing a "rule of reason" barring FHA suits between parties to a contract. "[T]he sole requirement for standing to sue under [the FHA] is the Art[icle] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a dis-

tinct and palpable injury.' " *Havens Realty*, 455 U.S. at 372, 102 S.Ct. 1114 (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)) (emphasis added). *See also Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 75 (3d Cir.1998) (holding that "courts ... may not create prudential barriers to standing under the Act" when fair housing services providers sue for retaliation under § 3617).

██ The Supreme Court has established three requirements for standing under Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent.... Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted). In the context of a summary judgment motion, the plaintiff may not "rest on ... mere allegations, but must set forth by affidavit or other evidence specific facts...." *Id.* at 561, 112 S.Ct. 2130 (internal quotations and citations omitted).

In *Montgomery Newspapers*, the Third Circuit applied these standards to determine the standing of a fair housing organization to bring an FHA retaliation claim. The Fair Housing Council ("Council") had filed suit in district court alleging that the newspaper company had violated the FHA by publishing discriminatory housing ad-

---

1. The statute defines "person" to include "corporations" and "associations." 42 U.S.C. § 3602(d). As a non-profit corpora-

tion, the FHF is a "person" protected by the statute.

vertisements. In an amended complaint, the organization added allegations that Montgomery had retaliated against the Council as a result of the Council's complaint against Montgomery. The Council "contended that in newspaper articles, testimony before the state legislature, and other false statements ..., the [Council] had been placed in a position of ridicule which impaired the organization's effectiveness." 141 F.3d at 73. The Third Circuit held that the organization had established an "injury in fact" by showing it had been forced to answer questions posed by a government agency and to defend the basis for its earlier litigation. *Id.* at 81.[2]

## 2. THE FHF's STANDING TO BRING AN FHA CLAIM

 In this case, the FHF alleged that it "suffered injury in its ability to carry out its purposes ... to eliminate housing discrimination, to resolve fair housing disputes, [and] to find and make available decent housing...." In particular, the FHF alleged that the City had delayed payments due under the contract, "attempt[ed] to interfere with the investigation of fair housing complaints by FHF, failed to renew the FHF contract, fil[ed] a

retaliatory and frivolous third-party complaint against both the FHF and its Executive Director," and made "negative comments to at least one city administrator from a city other than Lakewood regarding the FHF's performance under its contract so as to attempt to interfere with the FHF's attempt to renew its contract with that city...."[3]

Because this case is at the summary judgment stage, the FHF must support those allegations with "specific facts." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. The FHF has met its burden. Viewing the facts in the light most favorable to the FHF, the record shows that the City withheld payment for several months (Letter from Sharon Weissman to Ebner of 9/26/93; Letter from Ebner to Weissman of 11/4/93); replaced the FHF without asking the FHF to submit a new proposal (Decl. of Shull on 5/3/99); called the Housing Manager for the City of Downey to complain about the FHF's performance (*id.*); and sued the FHF. These actions by the City resulted in direct and immediate injuries to the FHF. In addition, the FHF alleges that it lost staff time spent responding to the City's retaliation (Dep. of Shull on 4/6/99), and lost several other

**2.** Although both parties discuss our recent decision in *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470 (9th Cir.1998), that case is inapposite. The *San Pedro* plaintiffs' standing to sue under § 3617 was not at issue in the appeal. 159 F.3d at 476 n. 10.

**3.** The FHF also alleges that it has suffered economic injury "in enforcing FHF's rights by way of this counterclaim...." Several circuit courts have held that standing must be established independent of the lawsuit filed by the plaintiff. *See, e.g., Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit...."); *Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 80 (3d Cir.1998) ("[T]he pursuit of

litigation alone cannot constitute an injury sufficient to establish standing under Article III."). Because we agree that a plaintiff cannot establish standing simply by filing its own lawsuit, we will not consider the time and money the FHF has expended in prosecuting this suit in deciding if the FHF has standing to pursue the retaliation claim.

However, the City's breach of contract claim against the FHF may be considered a retaliatory action. *See United States v. Wagner*, 940 F.Supp. 972, 978–80 (N.D.Tex.1996) (holding that a lawsuit can be a retaliatory action giving rise to a § 3617 claim). Therefore, we do consider the time and money the FHF expended defending itself against the City's claims, as well as any reputational harm suffered, in deciding if the FHF has alleged an "injury in fact."

contracts (Decl. of Shull on 5/3/99). These injuries are, at least, indirectly attributable to the City's actions. Any time, money, or business lost could be directly redressed by a damage award. Accordingly, we conclude that the FHF has standing to sue the City for retaliation under § 3617.

### 3. THE FHF'S RIGHT TO BRING A CLAIM UNDER THE FEHA

The FHF also brought a claim under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12955.7, which likewise prohibits retaliation against fair housing advocacy. The district court granted summary judgment for the City based on two alternative holdings. First, the court held that the FEHA does not cover independent contractors. Second, the district court held that because the FHF does not have standing under the federal FHA, it likewise does not have standing under the FEHA. We again disagree and conclude that the FHF has standing to sue the City under the state FEHA, as well as the FHA.

▉▉▉ Because the California Supreme Court has not addressed this question, our task is to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Nat'l Labor Relations Bd. v. Calkins,* 187 F.3d 1080, 1089 (9th Cir. 1999) (internal citations and quotations omitted). In California's intermediate courts, the question of whether the FEHA protects independent contractors is unsettled. *See, e.g., Sada v. Robert F. Kennedy Med. Ctr.,* 56 Cal.App.4th 138, 144, 65 Cal.Rptr.2d 112 (1997) ("We find it unnecessary to decide whether the Act covers independent contractors."). In predicting how the California courts will resolve this issue, we are mindful of the fact that the FEHA covers two rather unrelated areas of discrimination, both employment and housing. And we recognize that an argument that the FEHA would not cover independent contractors bringing suits for **employment** discrimination because they are not employees would require a different analysis than we conduct here. But even if the legislature intended to draw a line between independent contractors and employees in the employment discrimination context, there is no logical reason that the FEHA would not protect independent contractors engaged in fair housing advocacy from retaliation. *Cf. Bd. of County Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 686, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) ("recogniz[ing] the right of independent contractors not to be terminated for exercising their First Amendment rights").

More importantly, looking to our own interpretations of the FEHA, we have already held that even parties who may not bring **discrimination** claims under the FEHA may bring **retaliation** claims. *See Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 868 (9th Cir. 1996) (as amended) ("[E]ven if Strother cannot bring a FEHA discrimination claim, she can still assert a FEHA retaliation claim if she had a 'reasonable' belief that she had a legitimate FEHA claim ....") (emphasis in original); *see also Moyo v. Gomez,* 40 F.3d 982, 985 (9th Cir.1994) (as amended) ("[R]egardless of whether the inmates in this case actually qualified as employees, Moyo would be able to state a retaliation claim if he could show that his belief that an unlawful employment practice occurred was 'reasonable.'"). In determining if the FEHA's anti-retaliation provisions cover the FHF, California courts would likely apply the same standards as applied under the federal FHA. *See Sada,* 56 Cal.App.4th at 150 n. 6, 65 Cal.Rptr.2d 112 ("In applying the

provisions of the FEHA, California courts often follow decisions construing federal antidiscrimination statutes, as long as those decisions provide appropriate guidance."). Because the FHF can maintain an action under § 3617, we conclude that it also can bring a retaliation claim under the FEHA.

**B. SUMMARY JUDGMENT ON THE FHA AND FEHA CLAIMS**

Having determined that the FHF has Article III standing and that the FEHA protects independent contractors in the housing discrimination context, we now turn to the questions of whether it has stated a cognizable claim for retaliation under the FHA and FEHA and, if so, whether those claims survive summary judgment. The answer to both questions is, yes.

### 1. SCOPE OF § 3617

■ The mere fact that the parties were subject to a contract that could be canceled by either party at any time does not bar this suit. District courts have repeatedly allowed employees to pursue § 3617 retaliation claims against their employers after they were terminated. In those cases, presumably, the employees were working under employment-at-will contracts that could have been canceled at any time. But the FHA nevertheless prohibits employers from canceling those contracts in retaliation for fair housing advocacy. *See, e.g., Meadows v. Edgewood Mgmt. Co.*, 432 F.Supp. 334, 335 (W.D.Va. 1977) (holding that § 3617 "provides a remedy in a situation where a resident manager and maintenance technician are dismissed by their employees because of their aid or encouragement to tenants in asserting their right to fair housing"); *Vercher v. Harrisburg Hous. Auth.*, 454 F.Supp. 423, 424 (M.D.Pa.1978); *Wilkey v. Pyramid Constr. Co.*, 619 F.Supp. 1453, 1455 (D.Conn.1985). And in *Smith v. Ste-*

*chel*, 510 F.2d 1162 (9th Cir.1975), we held that a § 3617 claim by an apartment manager against the management company, alleging that he was fired for renting to black and Mexican–American tenants, was not barred by the statute of limitations. We did not question whether the claim could proceed despite the contractual relationship between the parties.

■ The City responds that the contract in this case was not canceled but instead was merely not renewed. No court has yet addressed the question of whether the failure to renew an annual contract may be the basis of an FHA retaliation claim. We conclude that this situation is analogous to the more-familiar situation of a retaliatory failure-to-hire in the Title VII and First Amendment contexts. In *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986) (as amended), we held that a former part-time instructor could bring a Title VII retaliation claim if the tenure-track teaching "position for which she applied was eliminated or not available to her because of her protected activities." *See also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("Even though he could have been discharged for no reason whatever, ... he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms."). Similarly, here, the FHF has alleged that the City refused to consider it for the 1994–95 contract because of its protected activities. As we explain below, there is no reason that the principles established in our other cases should not also apply in the FHA retaliation context.

The cases the City cites in support of its position that the FHF's suit may not survive are distinguishable. As an initial mat-

ter, the City argues that the FHF is really contesting how the City chooses to spend the funds it receives from the Department of Housing and Urban Development, a challenge which only the federal government may bring under the Housing and Community Development Act ("HCDA"), 42 U.S.C. §§ 5301—5321, because that statute does not provide for a private right of action. *See Nabke v. U.S. Dep't of Hous. and Urban Dev.*, 520 F.Supp. 5 (W.D.Mich.1981); *see also Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (holding that federal courts may not create private rights of action in statutes that do not otherwise provide for private suit). However, nothing in HCDA or *Nabke* suggests that an aggrieved party may not proceed under a statute, such as the FHA, which explicitly provides for a private right of action, 42 U.S.C. § 3613, if the defendant's use of HCDA funds violates that other statute. Furthermore, because the HCDA was enacted subsequent to the FHA, to hold otherwise would be to work a highly-disfavored repeal by implication. *See Tinoqui–Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1306 (9th Cir.2000). Such a repeal would require a clear indication of Congressional intent, and there is no indication that a repeal was intended.

Second, the City contends that it was entitled to respond when the FHF accused the City of racism. *See Frazier v. Rominger*, 27 F.3d 828, 834 (2d Cir.1994) ("Nowhere in these sections ... can be found a right to question the potential racial motivations of landlords."). Even if we accept the City's charge, that the FHF did accuse the City of racism in its press release, the FHF engaged in a variety of other activities on behalf of the Park Tenants which are protected against retaliation.

Next, the City contends that it merely engaged in "economic competition" when it hired a new fair housing services provider, action that cannot give rise to a retaliation claim. *See Michigan Protection & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 348 (6th Cir.1994) (holding that "economic competition" does not constitute "interference" under § 3617). In *Babin*, defendant Florence Hammonds was negotiating to lease a house she owned to an organization that runs group homes for the mentally disabled. The defendant neighbors objected and raised enough money to buy the home from Hammonds. The plaintiffs sued, claiming, inter alia, a violation of § 3617.

The Sixth Circuit's "economic competition" holding is, however, factually distinguishable. That holding applies only to the suit against the neighbors, who were merely competing with the group home for control of the property. The FHF has not sued the party engaged in economic competition in this case, the City's new fair housing services provider. Furthermore, unlike defendant Hammonds, the City did more than seek other bids and award the contract to another party; according to declarations submitted by the FHF, the City actually excluded the FHF from the competition for the 1994–95 contract. The FHF has also presented evidence, which we discuss below, that the City's motivation was retaliatory and not "purely economic." *Id.* at 348.

Lastly, the City suggests that contract law bars the FHF's suit. But because the FHA explicitly preempts any state law "that purports to require or permit any action that would be a discriminatory housing practice under this subchapter," 42 U.S.C. § 3615, we may not defer to state contract law principles in resolving this case. *See also Larkin v. State of Mich. Dep't of Social Servs.*, 89 F.3d 285, 289 (6th Cir.1996) (discussing FHA preemption).

In sum, the City has not provided a persuasive reason that we should not apply our well-settled principles for retaliation claims to this case. Our straightforward review of the facts reveals that this case is extraordinarily similar to those other retaliation cases and falls within the purview of § 3617. The FHF has alleged that, in response to protected advocacy, the City engaged in a series of actions designed to coerce and intimidate the FHF into changing or ceasing their activities. Therefore, the FHF has stated a cognizable claim under the FHA, and we proceed to determine whether the FHF introduced sufficient evidence to survive summary judgment.

### 2. SUMMARY JUDGMENT

 As with any retaliation claim, we apply the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994). If a plaintiff has presented a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* at 1464–65. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.*

 The FHF has shown that it participated in a protected activity, "aid[ing] or encourag[ing]," 42 U.S.C. § 3617, the Park Plaintiffs in the exercise of their fair housing rights. The FHF met with the Park Tenants, presented them with their options, and referred them to an attorney; served in a "paralegal capacity" for the attorney; continued to investigate the Park Apartments, using their usual techniques; issued a press release and conducted a press conference in conjunction with the filing of the lawsuit; and attempted to join the lawsuit as a plaintiff.

 Viewing the facts in the light most favorable to the FHF, the organization has also shown that it suffered an adverse action. In the context of a § 3617 claim, that adverse action must be in the form of "coerc[ion], intimidat[ion], threat[s], or interfere[nce]." 42 U.S.C. § 3617. FHF has not sought to distinguish among these statutory terms, nor does the statute provide any definition. In determining what those terms mean, "we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir.1996) (internal quotation marks and citation omitted). As an initial matter, we observe that § 3617 does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability. When Congress intended to require such a showing, such as in the FHA's criminal provision, it did so. *Compare* 42 U.S.C. § 3631 (imposing criminal liability when one "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure intimidate or interfere with" fair housing rights) *with* 42 U.S.C. § 3617 (making it "unlawful to coerce, intimidate, threaten, or interfere with any person" in retaliation for fair housing activity). *See also Babin*, 18 F.3d at 347 ("Section 3617 is not limited to those who used some sort of 'potent force or duress'...."). Turning to the plain meaning of these terms, we see that the City's alleged activities could be character-

ized as interference, coercion, or threats.[4] "Interference" is "the act of meddling in or hampering an activity or process." *Webster's Third New Int'l Dict.* 1178 (14th ed.1961). To "coerce" is "to compel to an act or choice by force, threat, **or other pressure.**" *Id.* at 439. And, more relevant for this case, "coercion" includes "the application of sanctions or force by a government [usually] accompanied by the suppression of constitutional liberties in order to compel dissenters to conform." *Id.* Finally, a "threat" is "an expression to inflict evil, injury, **or other damage** on another." *Id.* at 2382.

▬▬▬▬ The Supreme Court has instructed that we are to treat "[t]he language of the [FHA as] broad and inclusive." *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). We have previously explained that "interference," in particular, " 'has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.' " *United States v. Hayward,* 36 F.3d 832, 835 (9th Cir. 1994) (quoting *Babin,* 18 F.3d at 347) (internal quotation marks omitted). Most of the evidence presented by the FHF demonstrates that the City "interfered," or meddled, with its ability to conduct its fair housing activities. The City supervised the organization more closely than it had before, by sending city officials to monthly meetings, and also asked the FHF to "curtail the amount of exposure" it gave discrimination complaints. Additionally, the City contacted other cities to complain about the FHF and also filed suit against the FHF for breach of contract, which required time and money to defend.[5] Lastly, the City refused to renew the FHF's contract, which altogether prevented the organization from working in Lakewood.[6] Cf. *California Acrylic Indus. Inc.*

4. "Intimidation" would require a showing that the City's activities had generated fear in the FHF. *Webster's Third New Int'l Dict.* 1184 (14th ed 1961). There has been no such showing.

5. The City's right to engage in these types of activities may be protected under the Noerr–Pennington doctrine, named after the two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The Noerr–Pennington doctrine was originally developed to protect companies who lobbied the government or who sought redress from the courts from liability under the Sherman Act. *See, e.g., Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("Those who petition government for redress are generally immune from antitrust liability."). This doctrine has been extended beyond its original context,· and may be invoked in at least some limited cases by governmental entities, *Manistee Town Ctr. v. City of Glendale,* 227 F.3d 1090, 1094 (9th Cir.2000) (holding that city may invoke Noerr–Pennington defense to protect lobbying of county government).

But even if we were to apply *Manistee* to the City's alleged conduct in this case, the City's third-party suit against the FHF would not be protected activity under the Noerr–Pennington doctrine if it was "objectively baseless." *Prof'l Real Estate Investors,* 508 U.S. at 60, 113 S.Ct. 1920. In addition, the City's communications with other cities regarding FHF must constitute "petitioning" within the meaning of *Manistee. Manistee,* 227 F.3d at 1093–94. It is not clear from this record whether these standards are met and, therefore, whether the City ought to be able to claim a Noerr–Pennington defense with regard to these two types of conduct. Because there are genuine issues of fact regarding the City's alleged retaliatory conduct, we leave these issues for the district court to resolve on remand. With regard to the other allegedly retaliatory conduct, the doctrine does not apply and the City has no Noerr–Pennington defense.

6. The City suggests that the termination of the contract cannot be an adverse action because FHF was not making a profit on the contract.

*v. Nat'l Labor Relations Bd.*, 150 F.3d 1095, 1099 (9th Cir.1998) (holding that surveillance can constitute "interference" in violation of the National Labor Relations Act ("NLRA"), which prohibits "interfer[ing] with, restrain[ing], or coercing employees in the exercise of the rights guaranteed" by the Act).[7]

The FHF has presented further evidence of the City's conduct that, while certainly interference, might also be considered coercion or threats. The City suggested it would not renew the contract if the FHF did not apologize when Ebner sent a letter stating that "[t]he handling of The Park apartments case, and in particular the press conference, leaves us with serious concerns for the future...." *Cf. Lear Siegler Inc. v. Nat'l Labor Relations Bd.*, 890 F.2d 1573, (10th Cir.1989) (finding that management violated the NLRA when it told the employees "they would be permanently replaced if they participated in a strike."). Further evidence of coercion is the letter from Ebner stating that payments would be withheld until the organization apologized.

Finally, the FHF has demonstrated the requisite causal link. As detailed above, the City sent its first letter to the FHF less than two weeks after receiving a complaint from the Park Apartments management company. That letter suggested that the City would not renew the FHF's contract without an apology for the Park Apartments investigation and lawsuit. The City's second letter acknowledges that it withheld payment because it was waiting

for that apology and "some assurance on the part of the FHF that a similar scenario will not occur in the future...."

The City, in turn, has met its burden of articulating a nonretaliatory reason for its actions. It alleges that the FHF was not complying with its contract, by not providing promised outreach activities, making necessary reports to the City, or undertaking pre-litigation conciliation efforts, and by using its office for the press conference.

The FHF's approach to a showing of pretext is two-pronged. First, while admitting it was not providing the City with case narratives, the FHF contests the City's claim that it was in violation of its contract, contending that it always submitted its monthly reports; that it is common practice for fair housing organizations to participate in press conferences; that it was not contractually obligated to report to the City prior to taking action; and that the FHF and the Park Tenants' attorneys attempted to conciliate the claims prior to filing the lawsuit. There is, we conclude, a disputed issue of material fact regarding whether the FHF was in compliance with its contract.

Second, the FHF identifies evidence that it asserts shows its protected activities were the real reason for the City's actions. The City had never before complained about the services the FHF was providing and had always renewed the contract without requesting new bids. The City only began to investigate and interfere with the FHF after receiving a

---

The adverse action, however, is the "interfere[nce]" with FHF's activities, not any loss of income. Loss of profit is only relevant at the damages stage. *Cf. Bd. of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668, 685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) ("[E]vidence of mitigation of his loss by means of his subsequent contracts with the cities[ ] would be relevant in assessing what remedy is appropriate.").

7. The similarity of the language of the two statutes is a strong indication that they should be treated in the same manner. *See Bachelder v. America West Airlines*, 259 F.3d 1112 (9th Cir.2001) (citing *Northcross v. Bd. of Educ. of the Memphis City Schs.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973)).

letter from Scott Barker, of the Park Apartments management company, complaining about the lawsuit. In her declaration, Barbara Shull alleges that the City's reaction was not prompted by the alleged accusation of racism but was an attempt to placate Barker and his company. She claims that City Administrator Howard Chambers told her, "You need to understand the relationship between the City of Lakewood and the owners of the Park Apartments. . . . [Barker] continue[s] to invest millions of dollars in the City of Lakewood. This is no way to reward him for all the help he has given the City." Chambers denies making these statements. But if Shull's account is true, this would support the FHF's position that the City's motives were retaliatory. We conclude that there is a disputed issue of material fact regarding the City's motivations.

■ Accordingly, we reverse the summary judgment on the FHA and FEHA[8] claims and remand for further proceedings in accordance with this opinion.

## C. SUMMARY JUDGMENT ON THE § 1983 CLAIM

■ The district court also granted summary judgment for the City on the FHF's 42 U.S.C. § 1983 claim that the City impermissibly retaliated against the FHF for exercising its First Amendment rights. The court found that, under *Biggs v. Best, Best & Krieger,* 189 F.3d 989 (9th Cir.1999), the FHF held a confidential and policymaking position. Therefore, the court ruled, "the City could terminate its relationship with FHF for purely political reasons without violating FHF's First Amendment rights. . . ." We affirm this ruling.

In *Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998), we suggested

that it was "most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision." A year later, in *Biggs,* relying on *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), we confirmed that "an employee's status as a policymaking or confidential employee [is] dispositive of any First Amendment retaliation claim." 189 F.3d at 994–95 (citing *Fazio v. City and County of San Francisco,* 125 F.3d 1328, 1332 (9th Cir.1997)). Therefore, we first ask if the FHF was in a policymaking or confidential position. Only if the FHF was not in such a position do we ask if the FHF's activities were protected under *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The FHF's initial argument that *Biggs* should not be applied in this case because of the FHF's status as an independent contractor is unavailing. In *Biggs* itself, the plaintiff, an attorney hired to provide legal services for the city, appears to have been an independent contractor hired to provide legal services for the city. The Supreme Court's decisions in *Bd. of County Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), and *O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), applying *Pickering* to claims by independent contractors, are not to the contrary. In neither case was there evidence presented that the plaintiffs (a waste disposal company and a trucking company, respectively) were in policymak-

---

**8.** Because we apply the same standards to FHA and FEHA claims, *Sada,* 56 Cal.App.4th at 150 n. 6, 65 Cal.Rptr.2d 112, the *McDon-* *nell Douglas* analysis applies to the FEHA claim as well.

ing positions. In *Northlake*, the Court suggested that the *Branti* exception for cases in which "the service provider's political 'affiliation is an appropriate requirement for ... effective performance'" would apply to independent contractors as well as employees. 518 U.S. at 724, 116 S.Ct. 2353 (quoting *Branti*, 445 U.S. at 518, 100 S.Ct. 1287). Had there been an argument that the plaintiffs in *Umbehr* and *Northlake* were in policymaking or confidential positions, the Court certainly would have applied the *Elrod–Branti* exception. *See Umbehr*, 518 U.S. at 677, 116 S.Ct. 2342 ("applying our existing framework for government employee cases to independent contractors").

■■■ There is a split among the circuits as to whether the policymaker analysis is a question of law or fact. *Compare Gordon v. County of Rockland*, 110 F.3d 886, 888 (2d Cir.1997) (question of law), *with Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir.1999) (question of fact). We have not yet stated clearly which approach we find to be correct. *See, e.g., DiRuzza v. County of Tehama*, 206 F.3d 1304 (9th Cir.2000). In *Elrod*, 427 U.S. at 352, 96 S.Ct. 2673, Justice Brennan, delivering the opinion of the court, explained that the determination "whether the politically motivated discharge of employees ... comports with the limitations of the First and Fourteenth Amendments [is] solely a question of constitutional interpretation, a function ultimately the responsibility of this Court." After considering the various approaches, we think the question is best characterized as a mixed question of fact and law. Determining the particular duties of a position is a factual question, while determining whether those duties ultimately make that position a policymaking or confidential question is a question of law. As with all mixed questions, we conduct a de novo review. *United States v. City of Spokane*, 918 F.2d 84, 86 (9th Cir.1990).

■■■ This analysis is not intended to be formalistic. In *Fazio*, we explained that "the essential inquiry is 'not whether the label "policymaker" or "confidential" fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" 125 F.3d at 1331 (quoting *Branti*, 445 U.S. at 518, 100 S.Ct. 1287). In *Biggs*, we extended this reasoning and explained that the policymaker exception is not to be limited to "party affiliation," but should also include termination based on "political affiliation," which "includes commonality of political purpose and support." 189 F.3d at 996 (citation and internal quotation omitted).

■■■ We have set forth nine factors that should be taken into account in this analysis: "whether the [plaintiff] has vague or broad responsibilities, in addition to the [plaintiff's] relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Biggs*, 189 F.3d at 995 (citation and internal quotations omitted). The Supreme Court has advised that we may also consider the purpose of the particular position in question. *See Branti*, 445 U.S. at 519, 100 S.Ct. 1287 ("[I]t would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party.").

Considering these factors, we conclude that the FHF was in a policymaking position. The FHF's role with regard to the City is closely analogous to that of the zoning board in *Pleva*, in which "Board members [were] given considerable discre-

tion to implement the broad goals of city zoning policy." 195 F.3d at 913. The most critical factor is the FHF's influence over City programs: the City had delegated total control over its fair housing program to the FHF. Second, the FHF had relatively unfettered responsibilities. Although the FHF had a number of specific duties under the contract, its mission was broadly defined, to implement and operate a fair housing counseling program for the City. The FHF had the discretion to determine how best to carry out that mission. *Cf. id.* (holding that although the zoning board had a number of specific tasks, it also had "broad discretionary policymaking powers"). Third, the FHF was hired particularly for its technical competence in the area of fair housing. Fourth, the public would have perceived the FHF as the City's official fair housing agency. The FHF was also privy to confidential information received from citizens who contacted the organization for counseling and referrals. Because of the FHF's wide-ranging control over the City's fair housing program, we do not consider it significant that the organization had limited contact with elected officials or authority over other city agencies.

Two factors do weigh against finding that the FHF is a policymaker. The contract was clear that the FHF did not have the authority to speak as an agent of the City. However, this factor is outweighed by the fact that the FHF was the sole agency in the City addressing fair housing concerns and the public would have viewed it as having some official authority to speak. More significant is the fact that the FHF's contract specifically contemplated that it would be politically neutral, rather than responsive to partisan politics and political leaders. Nevertheless, while enforcing federal and state fair housing laws is a neutral agenda, the proper way of carrying out that mission, whether through lawsuits or counseling or education, often

have political implications. *Cf. id.* ("One can only assume that individual members will flesh out the meaning of [the board's mandate] with their own policy, and inevitably political, interpretations of what is in the best interest of the public."). In sum, the factors indicating that the FHF was in a policymaking position outweigh those that indicate that it was not.

Having determined that the FHF was in a policymaking position, we must also find, under *Biggs*, that it cannot proceed with its § 1983 suit. 189 F.3d at 994–95. We therefore affirm the district court's summary judgment on the § 1983 claim.

AFFIRMED in part, REVERSED in part, and REMANDED.