**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHLEEN NICHOLS,
              *Plaintiff-Appellant,*

              v.

LAURA DANCER, in her official
capacity and individual capacity;
JAMES L. HAGER, in his official
capacity and individual capacity;
and WASHOE COUNTY SCHOOL
DISTRICT, a political subdivision of
the State of Nevada,
              *Defendants-Appellees.*

No. 07-15654

D.C. No.
CV-04-00559-
LRH/LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
October 23, 2008—San Francisco, California

Filed May 18, 2009

Before: J. Clifford Wallace, Sidney R. Thomas and
Susan P. Graber, Circuit Judges.

Opinion by Judge Thomas

5965

## COUNSEL

Jeffrey S. Blanck, Reno, Nevada, for the appellant.

C. Robert Cox, Christopher D. Jaime, Maupin, Cox & LeGoy, Reno, Nevada, for the appellees.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question of whether the patronage dismissal doctrine immunizes public employers who terminate employees on the basis of perceived lack of personal loyalty. We conclude that it does not and remand for further proceedings.

I

Kathleen Nichols worked for the Washoe County School District for nine years, her last six as an administrative assis-

tant to the General Counsel for the district, Jeffrey Blanck. Over the course of the six years that Nichols worked for Blanck, they became friends. In her position as assistant to Blanck, Nichols was privy to sensitive information about confidential negotiations as well as information about employees, their backgrounds, and disciplinary measures. By all accounts, the school district had no problems with Nichols or her job performance. In job evaluations, Nichols received only "commendable" and "competent" marks, the two highest marks.

Blanck began having problems with the School District Superintendent James Hager. The District transferred Nichols to a job in Human Resources in January 2004 while it decided whether to terminate Blanck. By that time, Nichols had learned that Blanck had hired legal counsel in case he was terminated.

The District's Board of Trustees held an open meeting to discuss Blanck's future with the District, among other items. The day before the meeting, Nichols spoke with Laura Dancer, the Assistant Superintendent in charge of Human Resources, about her job security. Dancer told Nichols that after the board meeting, Nichols "would be restored to her position as administrative assistant to general counsel, whomever that general counsel was to be."

Nichols testified that she attended the board meeting for two reasons: to support a friend in a different department who was to receive an award and to see what would happen to her employer, Blanck. In Nichols's words:

> I wanted to find out what was going to happen with [Blanck's] position with the District . . . . I had been in at the beginning of the formation of the legal division and . . . I felt that it was of great interest to me to see whether or not that division was going to be continuing or not . . . . Nichols denies that she attended the meeting to support Blanck. No one

alleges that Nichols spoke publicly during the meeting.

When Nichols arrived at the meeting, the room was crowded. Nichols sat next to Blanck, who was already seated. Later in the meeting, the Board voted to terminate Blanck.

The next day, Dancer reconsidered her promise to reinstate Nichols as the assistant to the new Legal Counsel. Dancer stated that:

> After the night of the meeting, it was clear to me that Mrs. Nichols' continued contact and support and interest in Mr. Blanck posed a conflict for her to be in the legal counsel office . . . . After attending the open meeting, I did reconsider my earlier decision about her placement and determined that her placement needed to be other than the legal counsel office.

Aside from Nichols's seat next to Blanck at the open meeting, the record provides no other reason why Dancer would reconsider her earlier statement to Nichols.

Nichols met with Dancer the day after the meeting. Dancer told Nichols that she would not be transferred back to the Legal Counsel's office and that her salary would be frozen at its current level for one year. According to Nichols, Dancer said that they were "forced to question" her loyalty. Nichols expressed her unhappiness with that decision, and Dancer asked Nichols whether she had considered retirement as an alternative to continuing work in the Human Resources department. Nichols had never spoken to Dancer about the possibility of retirement. Nichols stated that she had the feeling that she "really wasn't wanted around there."

Soon after the board meeting, Nichols was in her office when Blanck called her. Nichols informed Blanck that she

would be taking some time off, that outside counsel was coming into the office, and that Dancer had requested a list of ongoing matters. Dancer considered this communication to contain "very sensitive information, including information pertaining to Mr. Blanck's own case" against the District for wrongful termination. Dancer considered the contact "inappropriate." After Nichols gave Blanck this information, the District claims that some files went missing. Following the phone exchange between Nichols and Blanck, Nichols took some time away from work. She eventually decided to retire, allegedly "to her severe financial detriment."

Nichols sued Dancer, Hager, and the Washoe County School District for First Amendment retaliation and claimed that by firing her, Defendants violated her First Amendment right to associate with Blanck. The district court granted Defendants' motion for summary judgment, holding that Nichols was a confidential employee vulnerable to a patronage dismissal without regard for her First Amendment rights.

## II

### A

**[1]** A public employer may not unduly abridge an employee's First Amendment rights. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-06 (1967). However, government employers may restrict their employees' speech more than the government may restrict the speech of it constituents. *Hudson v. Craven*, 403 F.3d 691, 696 n.1 (9th Cir. 2005) ("[T]he government as employer indeed has broader powers to regulate speech than does the government as sovereign.").

To establish a prima facie case of First Amendment retaliation, a government employee must show that "(1) she engaged in protected speech; (2) the defendants took an 'adverse employment action' against her; and (3) her speech was a 'substantial or motivating' factor for the adverse employment

action." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)).

In the paradigmatic case, if the government employee can succeed in her prima facie claim, the burden shifts to the governmental defendants

> to demonstrate either that, under the balancing test established by *Pickering v. Board of Education . . .* the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy City School District Board of Education v. Doyle . . .* the employer "would have reached the same decision even in the absence of the [employee's] protected conduct."

*Thomas*, 379 F.3d at 808 (citations omitted).

In *Pickering*, the Supreme Court stated that in First Amendment cases against a state entity, "[t]he problem . . . is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

**[2]** Under certain circumstances, a public employer is permitted to take adverse employment action against an employee for engaging in speech that is normally protected by the First Amendment, and the court need not conduct a *Pickering* balancing test. For example, the patronage dismissal doctrine allows public employers to terminate certain public employees on the basis of their political beliefs and loyalties. *See generally Branti v. Finkel*, 445 U.S. 507 (1980). Here, the district court found that Nichols was a confidential employee and that her termination was a patronage dismissal. Accord-

ingly, the district court granted summary judgment without conducting a full First Amendment examination or a *Pickering* balancing analysis. However, because Nichols was terminated for a perceived lack of *personal* loyalty, rather than *political* loyalty, we conclude that the patronage dismissal doctrine does not apply to her termination. We therefore must vacate the summary judgment and remand the case to the district court so that it may conduct a traditional First Amendment analysis.

B

**[3]** An employer engages in patronage dismissals when a newly elected or appointed public officer fires existing employees on the basis of their political beliefs or loyalties. *Elrod v. Burns*, 427 U.S. 347, 353 (1976). In *Elrod*, a newly elected Democratic sheriff fired four Republican employees in the sheriff's office because of their political beliefs. *Id.* at 350-51. To keep their jobs, the employees were required to "pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party." *Id.* at 355.

In *Elrod*, the plurality noted that "[i]t is not only belief and association which are restricted where political patronage is the practice. The free functioning of the electoral process also suffers." *Id.* at 356. For that reason, patronage dismissals survive constitutional challenge only when they "further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained . . . outweigh[s] the loss of constitutionally protected rights." *Id.* at 363. Justices Stewart and Blackmun, limiting the decision with their concurrence, held that "a non-policymaking, nonconfidential government employee [cannot] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375.

**[4]** The Supreme Court refined the patronage dismissal doctrine in *Branti v. Finkel*, 445 U.S. 507 (1980). In *Branti*, the Court held that a newly appointed Democratic Public Defender could not fire two Republican assistant public defenders on the basis of their political beliefs. *Id.* at 519-20. Although the new Public Defender was not elected himself, he had been appointed by a legislature with a newly Democratic majority. The Court abandoned the policymaking/ confidential distinction and instead held that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

**[5]** In both of these seminal cases, the constitutional analysis about party affiliation and job requirement was premised on dismissal motivated by political beliefs. *See also Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) (holding that promotion and transfer denials as well as failure to hire on the basis of political belief may also trigger the patronage dismissal doctrine's protection).

We have adhered to the guidance of the Supreme Court. In *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1334 (9th Cir. 1997), we held that a District Attorney could fire an Assistant District Attorney for running against him in an election. We reasoned that "[t]he rationale utilized to permit patronage dismissals in *Elrod* and *Branti* may also be applicable in the context of dismissals that are based on a public employee's *political activities*, such as running for office against an employer." *Id.* at 1331-32 (emphasis added). Although *Fazio* did not concern a newly elected official, it did concern a dismissal motivated by expressly political activities.

We have reached similar conclusions in other cases. *See Walker v. City of Lakewood*, 272 F.3d 1114, 1131-33 (9th Cir. 2001) (holding that a policymaking city contractor could not

bring a First Amendment § 1983 claim against the city after it was terminated for criticizing the city in a political register); *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 993-97 (9th Cir. 1999) (holding that an employee of a law firm responsible for some city functions could not bring a First Amendment § 1983 claim against the firm after she was terminated for the political statements of her family members). The conduct for which the employees in these cases were terminated was overtly political.

In concluding that the patronage dismissal doctrine applied and that Nichols was a confidential employee subject to abridged First Amendment rights, the district court relied on *Hobler v. Brueher*, 325 F.3d 1145 (9th Cir. 2003). In *Hobler*, we considered the dismissal of two assistants to a County Prosecutor. The plaintiffs were the former right-hand employees of the outgoing County Prosecutor and were terminated by the incoming Prosecutor "for expressing their political support for his election rival." *Id.* at 1148. We rejected the assistants' § 1983 claims because political loyalty was a requirement for the effective performance of the assistants' jobs.

**[6]** *Hobler* is distinguishable. The confidential secretaries in *Hobler* were fired because of their political beliefs and political support for the previous County Prosecutor. Nichols was fired because of her perceived personal association with the outgoing General Counsel; she never expressed her political loyalties.

**[7]** We hold that the patronage dismissal doctrine does not extend to adverse employment actions motivated by the employee's personal, rather than political, loyalties. The patronage dismissal doctrine is designed to ensure the integrity of the political process. To force a public official to work towards his or her goals with the assistance of employees who may be working against those goals has the potential to frustrate the will of the electorate. Personal disagreements do not

give rise to the same potential for electoral frustration. Some personal conflict exists in nearly every workplace, and severe personal conflicts may be resolved through performance evaluations or by resorting to the balancing test set out in *Pickering*. Extending the patronage dismissal doctrine to matters of personal loyalty would give public employers unjustified power to abridge their employees' First Amendment rights. We decline to extend the doctrine in that way.

In so holding, we join the analysis of the Fifth Circuit. In *Correa v. Fischer*, 982 F.2d 931 (5th Cir. 1993), the Fifth Circuit made a similar distinction between termination on the basis of political beliefs and termination on the basis of personal loyalty and compatibility. The court rejected the § 1983 claims of four staff members in the County Attorney's office who had been fired by an incoming County Attorney. The employees had previously worked for the outgoing County Attorney who opposed, but did not run against, the new County Attorney. However, the court found that the incoming and outgoing County Attorneys had a personal rather than a political conflict, and that the four employees were dismissed on the basis of personal disloyalty and incompatibility, not their political beliefs. *Id.* at 933-34. The court concluded that the political patronage dismissal doctrine did not apply to the employees and thus a policymaker/confidential analysis was unnecessary. *Id.* at 936.

For all these reasons, we conclude that the patronage dismissal doctrine does not apply to claims involving personal rather than political loyalty. Given our conclusion, we need not—and do not—reach the questions of whether Nichols was a policymaking/confidential employee or whether party affiliation was an appropriate requirement for her job.

### III

**[8]** Because the patronage dismissal doctrine does not apply, we must remand to the district court for re-

consideration of the claims under the traditional First Amendment government employee analysis. Although the parties invite us to conduct such an examination ourselves, we decline to do so. The district court did not reach that issue and we are not confident that the record is complete. Thus, the inquiry is more appropriate for the district court. We remand to allow the district court to conduct such an analysis in the first instance. We do not prejudge the outcome of that inquiry.

**REVERSED AND REMANDED**.